# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ATOTECH USA INC. | : | |
| and | : | |
| ATOTECH DEUTSCHLAND GMBH | : | |
| | : | Civil Action No. 05-5517 (FSH) |
| Plaintiffs, | : | |
| v. | : | |
| MacDERMID INC., | : | |
| Defendant. | : | |

## ATOTECH'S RESPONSE TO MACDERMID'S
## MOTION FOR SUMMARY JUDGMENT

William J. O'Shaughnessy
Richard Hernandez
MCCARTER & ENGLISH, LLP
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652
(973) 622-4444

Jay R. Campbell
Todd R. Tucker
Joshua M. Ryland
RENNER, OTTO, BOISSELLE
& SKLAR, LLP
19th Floor
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

# TABLE OF CONTENTS

I.    INTRODUCTION .............................................................................1

II.   ARGUMENT....................................................................................2

      A.   MacDermid Misappropriated Atotech's Proprietary Formulas. ............2

           1.   MacDermid Copied Atotech's Proprietary Formulas....................4

           2.   MacDermid Cannot Escape Liability For Deliberately
                Misappropriating Atotech's Proprietary Formulations By
                Arguing Its Formulas Fall Within The Scope Of Prior Art
                Patents. ............................................................................7

           3.   Federal Patent Law Does Not Preempt Trade Secret Laws............9

      B.   The Patents In Suit Are Valid. ............................................................10

           1.   The LPW Catalyst Application Does Not Disclose Using A
                Lead Anode, And Teaches That The Preferred Catalyst Is
                MSA. .................................................................................12

           2.   The LPW Anode Application Teaches The Use Of MSA With
                A Corrosion Resistant Lead Anode—It Does Not Teach Or
                Even Mention Using MDSA With A Lead Anode. ......................14

           3.   The Patents In Suit Are Not Obvious Over The LPW
                Applications. .....................................................................16

      C.   There Is No Inequitable Conduct—Atotech's Patents Are
           Enforceable.....................................................................................18

           1.   The European Patent Office and LPW Established That The
                LPW Catalyst Application Was Not Material. ..........................20

           2.   There Was No Deceptive Conduct In Not Providing A
                Complete Translation Of The LPW Anode Application To
                Patent Office.......................................................................23

           3.   Atotech Did Not Evade An Inquiry For The Patent Examiner
                Or Misrepresent Why MDSA Is Not Corrosion Producing..........24

      D.   MacDermid Infringes Atotech's '175 Patent ........................................24

III.  CONCLUSION.................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Display Sys., Inc. v. Kent State University*, 212 F.3d 1272 (Fed. Cir. 2000) .................................................................................. 14, 16

*Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380 (Fed. Cir. 1998) ........................................................................19

*Atlas Powder Co. v. Ireco Inc.,* 190 F.3d 1342 (Fed. Cir. 1999).............................13

*Atofina v. Great Lakes Chem Corp.*, 441 F.3d 991 (Fed. Cir. 2006) ......................23

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F. 3d 1332 (Fed. Cir. 2002) ...............................................................8

*Biodynamic Tech., Inc. v. Chattanooga Corp.*, 644 F. Supp. 607 (S.D. Fla. 1986)...........................................................................8

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989).....................9

*Franke v. Wiltschek*, 209 F.2d 493 (2nd Cir. 1953).....................................................8

*Freeman v. Gerber Prod. Co.*, 450 F. Supp. 2d 1248 (D. Kan. 2006) ....................14

*Glaxo Group Limited v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004)...................11

*Graham v. John Deere Co. of Kansas City*, 383 U. S. 1 (1966)..............................17

*Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435 (Fed. Cir. 1991).........................................................................21

*KangaROOS USA, Inc. v. Caldor, Inc.*, 778 F.2d 1571 (Fed. Cir 1985).................20

*Kewanee Oil Co. v. Bicron Corp.* 416, U.S. 470 (1974) ...........................................9

*KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007) ...........................................17

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335 (Fed. Cir. 2006) ........................................................................19

*Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956 (Fed. Cir. 1997) .........................19

*Monsanto Co. v. Mayer Bioscience N.V.*, 363 F.3d 1235 (Fed. Cir. 2004).............20

*Northern Telecom, Inc. v. Datapoint Corp,* 908 F.2d 931 (Fed. Cir. 1990)............20

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368 (Fed. Cir.2000) ..........................................................................................................24

*Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364 (Fed. Cir. 2002)......13

*Trintec Indus., Inc. v. Top-U.S.A. Corp.,* 295 F.3d 1292 (Fed. Cir. 2002)..............13

*Upsher-Smith Labs. v. PamLab, LLC*, 412 F.3d 1319 (Fed. Cir. 2005).................10

## STATE CASES

S.C. Code Ann. §39-8-20(5)(a)..............................................................................8

## I.   INTRODUCTION

Conspicuously short on citations to the record, MacDermid's motion for summary judgment repeatedly attempts to pass off innuendo as fact—and flatly ignores the evidence amassed against it.  MacDermid's argument denying theft of Atotech's chemical formulas is particularly illustrative:

► MacDermid does not deny or even mention that it surreptitiously obtained a sample of Atotech's HEEF 25 R liquid replenisher and copied it as ChromKlad 2500 L when it could not develop its own;

► MacDermid completely fails to mention that it misappropriated Atotech's trade secrets for the remaining ChromKlad component formulas by violating the confidentiality provisions of *two* license agreements that Atotech had with companies ultimately purchased by MacDermid; and

► MacDermid misleadingly relies on Atotech's expert's *test* for the *presence* of MDSA for infringement purposes to support its conclusion that the *formulations* are not stolen trade secrets, rather than citing the Court to the parties' official formulations that confirm ChromKlad 2500 L is *within 1/10th of one percent* of HEEF 25 R:



MacDermid's motions for summary judgment of invalidity, unenforceability and noninfringement are similarly contrived.  Atotech's patents are valid and enforceable.  The U.S. Patent Office and the European Patent Office have found the patents in suit and their foreign equivalents valid over the same LPW applications that MacDermid relies upon or references that MacDermid's expert considered to be "essentially the same." ███████████████████████ ███████████████████████████████████████ Lastly, the general counsel for MacDermid—after reviewing the LPW applications and Atotech's patents— recommended that MacDermid *change its formula* to avoid Atotech's patents.

MacDermid's motions for summary judgment should be denied.


## II.   ARGUMENT

### A.   MacDermid Misappropriated Atotech's Proprietary Formulas.

MacDermid *never* denies stealing Atotech's confidential formulations—it just argues it *could have* gotten them lawfully or that its deeds are absolved through a tortured notion of federalism.

In reality, MacDermid's deliberate scheme to obtain and copy Atotech's formulas—undisputed facts never mentioned in MacDermid's brief—only highlight that these formulas *are trade secrets* and *were stolen*:

2

- June 2004 – As part of MacDermid's goal to "replace all Atotech chemistry," MacDermid begins its efforts to replicate Atotech's HEEF 25 line by obtaining the formulation for Atotech's Mach 3 chemistry in violation of an agreement between Atotech and a company that MacDermid had recently purchased.  (Ex. A, Ex. B and Ex. C.)[1]

- July 2004 – MacDermid realizes that it must have a "Liquid replenisher" to compete with Atotech, but does not have access to Atotech's formulation.  (Ex. C.)

- July 2004 – After being informed by a MacDermid Global employee that the formulas for Atotech's mixed catalyst hard chrome system are protected from disclosure by a license, MacDermid decides to copy them anyway and in fact uses the "original documents by M&T," Atotech's predecessor.  (Ex. D.)

- September 8, 2004 – After all of the other components for ChromKlad 2500 have been finalized, Brad Durkin emails Ray Kern, "Need to have a sample of liquid to formulate [ChromKlad] 2500-L material."  (Ex. E, p. 2.)

- Same day – Kern responds to Durkin, "…I will then try to obtain a sample of the HEEF 25 liquid for evaluation."  (Ex. E, p. 1.)

- September 22, 2004 – Kern, Durkin and Mike Malik, a MacDermid chemist, meet.  Getting the formula for ChromKlad 2500 L is a "priority."  (Ex. F.)

- November 2, 2004 – Kern emails Durkin, "I met yesterday with Jim Schweitzer [Atotech distributor] and obtained a sample of the HEEF 25 liquid replenisher…."  (Ex. G.)  In exchange for the sample Kern promises to try to get Schweitzer a job at MacDermid, which later hires Schweitzer.

- November 16, 2004 – Kern emails Durkin, "Regarding the 2500L concentration…. I have a sample of the HEEF liquid replenisher that can also be used to verify the concentration, I simply need to figure out how to get the sample to New Hudson."  (Ex. H.)

---

[1]  The exhibits referenced by letter in this brief are exhibits to the attached Declaration of Todd R. Tucker.

- Mike Malik analyzes Kern's HEEF 25 R sample over the course of two weeks starting January 11, 2005, leading to the ChromKlad 2500 L formula. (Ex. I.)

One can only wonder—if Atotech's product formulations were not trade secrets, then why go to such great lengths to get them?

### 1.   MacDermid Copied Atotech's Proprietary Formulas.

MacDermid's claim that it did not "copy" Atotech's proprietary formulas because they are not "identical" is the worst kind of sophistry.

Instead of comparing the *actual formulas* for ChromKlad 2500 to the *formulas* for Atotech's HEEF, MacDermid compares the results of a rudimentary test performed by Atotech's expert to merely determine the *presence* of MDSA to confirm infringement.  MacDermid also adds a declaration from its general counsel *attesting* to a formula for ChromKlad 2500.  Despite the fact that the parties *produced* their exact formulations under the Court's protective order, MacDermid then claims this secondary "evidence is *indisputable* that MacDermid's products are substantially different from Atotech's products."  (MacDermid's Summary Judgment Brief, p. 44.)

Not so.  Below is an image of a MacDermid internal email, dated April 17, 2005 confirming the *actual* formula for ChromKlad 2500 L:

4



(Ex. J.)

Comparing MacDermid's ***actual formula*** for ChromKlad 2500 L to

Atotech's formula for HEEF 25 R (below) illustrates that ChromKlad 2500 L is

within less than 1/10th of a percent (.09%) of HEEF 25 R—not the 33% variance

MacDermid claims in its brief:



(Ex. K.)

This similarity is no accident.  ChromKlad 2500 L was the key missing

component necessary to duplicate Atotech's entire line of hard chrome products—

MacDermid's goal.  And to reverse engineer Atotech's HEEF 25 R product with

such close precision took MacDermid two weeks of intense testing.  (Ex. I.)

Obtaining the rest of Atotech's hard chrome formulas was comparatively

easy:  MacDermid simply ***violated the confidentiality provisions of two Atotech***

***license agreements***.  Through a series of purchases, MacDermid acquired two

different chemistry companies, in two separate countries, that were existing



product from scratch, MacDermid simply instructed those subsidiaries to send

Atotech's confidential formulations to MacDermid's lab in Michigan—in clear

violation of their license agreements with Atotech.

Indeed, MacDermid's president of MacDermid Global R&D, Max Garzone,

even brushed aside his subordinate's warning about violating the Galvanvet license

and authorized copying Atotech's CR family of mixed-catalyst products:

> Q.  All right. And do you see that you were requested
>     by Mr. Durkin to provide the formulations that
>     MacDermid had for [Atotech's] CR 110, CR 840,
>     and CR 842 specifically?
> A.  This is what I can read here, yes.
> Q.  All right. And Mr. Durkin asked for the
>     formulations of these products and you approved
>     these formulations to be sent to [] Mr. Durkin,
>     correct?
> A.  Correct.
>
>                 *       *       *
>
> Q.  You'll see on MacDermid 001546, Mr. Durkin
>     after your approval asked []Mrs. Antionetti
>     Marnotti for the formulas of CR 110, CR 840 and
>     CR 842, correct?
> A.  Yes.
> Q.  All right. And these are hard chrome products,
>     mixed catalyst products that MacDermid had
>     previously sold in Italy under a license from
>     Atotech, correct?
> A.  That is not correct.

> Q. What are they?
> A. MacDermid in 1998 acquired a business in Italy.
> Q. Yes.
> A. That business was selling under Atotech license these products.

(Ex. N, Garzone Depo., pp. 86-87; *see also*, Ex. D.)

Mike Malik, the chemist working with Kern and Durkin to "formulate" ChromKlad in Michigan, confirmed that he received those formulas and, in the case of Atotech's CR chemistries, merely copied the formulas into a table and labeled them "MacroKlad 1500"—now known as ChromKlad 1500, MacDermid's mixed catalyst product. (Ex. F, p. 1.) Similarly, Malik confirmed that he "Rcd [sic] Mach 3 + 1 Cr formulae from U.K." in July of 2004 (Ex. B), and Durkin confirms that Mach 3 was the starting point for ChromKlad. (Ex. O.)

Misappropriating Atotech's proprietary formulas, as well as Atotech's customer lists, pricing and marketing strategies, was a critical part of MacDermid's overall strategy to "inflict as much damage on [Atotech] as possible." (Ex. P.)

**2. MacDermid Cannot Escape Liability For Deliberately Misappropriating Atotech's Proprietary Formulations By Arguing Its Formulas Fall Within The Scope Of Prior Art Patents.**

To be clear, Atotech does not assert that MacDermid violates Atotech's trade secrets merely by selling a process with components that fall within certain

ranges. Atotech's trade secret claim is based on MacDermid's misappropriation of Atotech's *exact* product formulations—*formulations not appearing in any patent*.

The Federal Circuit has unequivocally held that South Carolina law protects such closely-guarded information that is "not known or readily ascertainable by the public." *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F. 3d 1332, 1340 (Fed. Cir. 2002); S.C. Code Ann. §39-8-20(5)(a)[2]. Were Atotech's formulations known or readily ascertainable, MacDermid obviously would not have had to resort to extreme measures to obtain them.

But it did. MacDermid broke license agreements between Atotech and two foreign companies to obtain the formulation for HEEF 25. And when MacDermid was unable to develop its own liquid replenisher, it stole and copied a sample of HEEF 25R. The impropriety of MacDermid's actions only underscores the confidential nature of Atotech's formulations:

> It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead, they gained it from plaintiffs via their confidential relationship, and in doing so incurred a duty not to use it to plaintiffs' detriment.

*Franke v. Wiltschek*, 209 F.2d 493, 495 (2nd Cir. 1953); *accord Biodynamic Tech., Inc. v. Chattanooga Corp.*, 644 F. Supp. 607, 611 (S.D. Fla. 1986).

---

[2] As set forth in Atotech's Amended Complaint, the situs of the harm for Atotech's trade secret misappropriation claim occurred in South Carolina. Atotech is seeking relief under the South Carolina Trade Secrets Act.

### 3. Federal Patent Law Does Not Preempt Trade Secret Laws.

Atotech's trade secret misappropriation claim is also not preempted by federal patent law. The Supreme Court has repeatedly recognized that "patent law does not pre-empt trade secret law." *Kewanee Oil Co. v. Bicron Corp.* 416 U.S. 470, 492 (1974) (citations omitted); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166 (1989) ("Both the law of unfair competition and state trade secret law have coexisted harmoniously with federal patent protection for almost 200 years, and Congress has given no indication that their operation is inconsistent with the operation of the federal patent laws.")

Atotech is not seeking "patent-like" protection for its trade secrets; it seeks relief for MacDermid's wrongful theft and copying of Atotech's specific product formulations. MacDermid's actions fall squarely within the realm of state trade secret law. *See, Kewanee,* 416 U.S. at 487 ("Nothing in the patent law requires that States refrain from action to prevent industrial espionage.") Atotech's trade secret claim for MacDermid's theft of Atotech's product formulations, therefore, is not preempted by federal patent law. Similarly, Atotech's claims against MacDermid for misappropriation of Atotech's customer lists and marketing strategies are also not preempted.

MacDermid's *partial* motion for summary judgment on Atotech's claim for trade secret misappropriation of formulas should be denied.

### B.    The Patents In Suit Are Valid.

Dr. Newby invented the use of an ***alkyl polysulfonic acid*** (such as MDSA)

with a ***lead anode*** in the ***absence of enough monosulfonic acid*** (such as MSA) to

prevent corrosion to the anode.  Pure and simple, this is disclosed ***nowhere*** in the

prior art.  Indeed, MacDermid's expert testified that the LPW applications that

MacDermid alleges invalidate the patents in suit actually teach exactly the

***"opposite."***  (Ex. Q, Baudrand Depo., pp. 115-116.)

MacDermid argues that the Court should disregard the invention, calling it

"absurd" and comparing it to Dr. Newby patenting the use of a polysulfonic acid

with lead anodes in the substantial absence of "chocolate milk."  (MacDermid's

Summary Judgment Brief, pp. 11-13, n. 5.)  The key problem with MacDermid's

analogy is that, unlike MSA, chocolate milk was not thought in the industry to be

the key ***ingredient*** for high-efficiency, etch-free chrome plating.  Dr. Newby went

against the conventional reasoning of the experts, including the LPW experts, and

replaced MSA with MDSA—even though MSA was thought to be the gold

standard in chrome plating.  Dr. Newby did not just remove an optional or non-

functional ingredient from the plating process as in the *Upsher-Smith*[3] case that

MacDermid relies upon.  He wholly changed the industry by doing something no

---

[3]   *Upsher-Smith Labs. v. PamLab, LLC*, 412 F.3d 1319, 1322 (Fed. Cir. 2005).

one had ever thought of or disclosed.  Indeed, that is precisely why MacDermid

reaches for the inapplicable doctrines of inherency and incorporation by reference.

Moreover, MacDermid ignores the statutory presumption of validity of the

patents and the fact that its burden of proving invalidity by clear and convincing

evidence is made "*especially difficult*" since it relies on information already

considered or "*essentially the same*" as that considered—and rejected—by the

Patent Office.  *Glaxo Group Limited v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed.

Cir. 2004); (Baudrand Depo., pp. 195-96.)

MacDermid also ignores the several independent and objective reasons

establishing the validity of Atotech's patents in suit over the LPW Anode and

Catalyst applications:

- The U.S. Patent Office, after considering the '481 Patent, the LPW Anode application, and the several "admissions concerning the prior art use of lead anodes" that MacDermid relies on its brief determined the patents in suit are valid;

- The European Patent Office, after considering the '481 Patent, the LPW Anode application and the LPW Catalyst application, found the European equivalents of Atotech's patents valid;

- Caterpillar, a potential customer for ChromKlad 2500, after receiving input from MacDermid, analyzed the patents in suit and concluded that they were valid and enforceable; (Ex. R.)

- LPW itself never thought of using a lead anode with MDSA to the substantial exclusion of MSA despite being the developer of the technology of the LPW applications;

11



- After having supposedly completed a review of the validity of Atotech's '813 Patent in connection with the LPW applications, MacDermid's general counsel instructed MacDermid to "change formulation [of ChromKlad 2500] based on Atotech's assertion of patent protection under US patent #5,176,813." (Ex. S.)

Yet, acutely aware of Atotech's patents, MacDermid decided to "*manufacture [Atotech's] HEEF products*" itself and then sell Atotech's patented HEEF 25 products as its own. (Ex. T.)

### 1. The LPW Catalyst Application Does Not Disclose Using A Lead Anode, And Teaches That The Preferred Catalyst Is MSA.

MacDermid's anticipation argument is nonsensical. MacDermid seems to argue that, since Atotech admitted to the Patent Office several times that the use of lead anodes is well known and that lead anodes are not themselves the invention, the LPW Catalyst application alone anticipates the patents in suit. Obviously the Patent Office disagreed, as it allowed both patents despite these admissions. In any event, however, anticipation requires that a *single* reference disclose within its four corners each and every element of the claimed invention either *expressly or*

*inherently*. *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). Just because it was well known that lead anodes were one of the several possible anodes that could have been used in the LPW Catalyst application does not mean that use of a lead anode was "expressly" disclosed in the LPW Catalyst application. It was not. That is why MacDermid asserts that a lead anode was "inherently" disclosed.

The key problem with MacDermid's inherency argument is that it can only prove that an anode is necessary—not a *lead* anode. Lead anodes were merely one type that might have been used, along with steel, iron, carbon, platinized titanium and beryllium oxide coated titanium. (Baudrand Depo., pp. 40, 70.) Mere knowledge, possibility or even probability, however, does not make inherency.

"[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must *necessarily* include the unstated limitation, [or the reference] cannot inherently anticipate the claims." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002) (emphasis in original). It is not sufficient if a material element or limitation is "merely probably or possibly present" in the prior art relied upon. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). The fact that the several other types of anodes work, standing alone, establishes that lead anodes *are not necessary*. Indeed, the other reference that MacDermid relies on, the LPW Anode application,

13

proves that lead anodes cannot be "*necessary,*" as inherency requires, because the

LPW application states that "[i]t has, therefore, been *necessary*, until the present

[after the filing of the LPW Catalyst application], *to employ titanium anodes*...."

(Ex. U, p. 3.)  Obviously, both cannot be *necessary*.

The LPW Catalyst application does not anticipate the patents in suit.

### 2. The LPW Anode Application Teaches The Use Of MSA With A Corrosion Resistant Lead Anode—It Does Not Teach Or Even Mention Using MDSA With A Lead Anode.

MacDermid casually argues that the nondescript "bath compositions" from

the LPW Catalyst application are "incorporated by reference" in the LPW Anode

application.  Incorporation by reference requires that the material be cited "in a

manner that *makes clear* that the material is effectively part of the host document

as if it were explicitly contained therein." *Advanced Display Sys., Inc. v. Kent*

*State University*, 212 F.3d 1272, 1282 (Fed. Cir.  2000)(emphasis added).

Moreover, the material to be incorporated must be identified with "*detailed*

*particularity*." *Id.* (emphasis added).  See also, *Freeman v. Gerber Prod. Co.*, 450

F. Supp. 2d 1248, 1258 (D. Kan. 2006.)

In contrast, the LPW Anode application does not: 1) make it clear that

material from the LPW Catalyst application is to be incorporated, and does not use

the phrases "incorporated," "reference" or other similar language; and 2) does not

state with "detailed particularity" what specific catalysts are to be incorporated or where those specific catalysts are found in the LPW Catalyst application. In fact, although the LPW Anode application states "hard chrome electrolytes containing alkyl sulfonic acids are known" from the LPW Catalyst application, the LPW Catalyst application does not use the phrase "alkyl sulfonic acid." (Ex. U, p. 2.) Thus, the mention of the LPW Catalyst application does not shed light on what the LPW Anode application means by "alkyl sulfonic acid," regardless of whether the LPW Catalyst application is incorporated by reference.

In fact, as MacDermid's expert conceded that the conventional usage of "alkyl sulfonic acid" means an alkyl *mono*sulfonic acid. (Baudrand Depo., pp. 122-123.) While in some contexts the phrase alkyl sulfonic acid may be used to denote a broader class of chemicals, that is not the case in the LPW Anode application. Indeed, MacDermid's expert confirmed that the LPW Anode application uses alkyl sulfonic acid in its conventional sense to mean a *mono*sulfonic acid, such as MSA. (Baudrand Depo. pp. 122-123.) Not surprisingly, MacDermid itself defined an alkane sulfonic acid, another name for an alkyl sulfonic acid, as an alkyl *mono*sulfonic acid alone—*i.e.,* MSA. (Ex. V, U.S. Patent No. 5,080,733 col. 2, lines 21-22 giving chemical formula for monosulfonic acid.)

15

In short, there is nothing to be gained by incorporating the disclosure of the LPW Catalyst application into the LPW Anode application. The only motivation to read the LPW Catalyst application into the LPW Anode application is MacDermid's motivation to try to create an anticipation argument *two decades later*.[4] Even LPW, owner of the LPW Anode application, did not read the Anode application to incorporate the LPW Catalyst application.

### 3.    The Patents In Suit Are Not Obvious Over The LPW Applications.

Although MacDermid argues that the claims of the patents in suit are obvious, it admits that the LPW Anode application teaches away from Dr. Newby's invention. (MacDermid's Summary Judgment Brief, p. 19.) MacDermid also states that the LPW Anode reference "teach[es] that the solution to lead anode corrosion lies within the composition of the lead anode"—not the composition of the secondary catalyst as Dr. Newby realized. (*Id.*) Therein lies the fundamental flaw in MacDermid's obviousness argument. While it might *speculate* in

---

[4]   Outside of this litigation, MacDermid knows the LPW Catalyst application is not incorporated by reference into the LPW Anode application. MacDermid regularly incorporates publications into its patents. For example, MacDermid's U.S. Patent No. 6,020,029 uses the phrase "the teachings of which are incorporated herein by reference in their entirety" to "*make[] clear* that the material is effectively part of the host document as if it were explicitly contained therein" and to distinguish from publications that are not incorporated. *See, Advanced Display Sys., Inc.*, 212 F.3d at 1282-83.

16

hindsight that it would be "obvious to try" what Dr. Newby invented—the actual evidence proves otherwise.

As the U.S. Supreme Court recently explained in, *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007), "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." As MacDermid admits, even the prior art that it alleges anticipates the patents in suit—the LPW applications—actually teach away from Dr. Newby's inventions. (MacDermid's Summary Judgment Brief, p. 19.)

The Supreme Court further endorsed using objective secondary considerations in determining whether a patent is nonobvious. *Id.* at 1734 (endorsing *Graham v. John Deere Co. of Kansas City*, 383 U. S. 1, 17-18 (1966)).

As noted above, every secondary consideration demands a finding that the patents in suit are valid: 1) LPW, the developer of both references that MacDermid relies upon, never thought it was "obvious to try" combining the teachings of its applications and any other teachings to achieve Dr. Newby's inventions; 2) ███████████████████████████████████████████ 3) an unbiased customer, Caterpillar, after consultation with MacDermid, determined the patents in suit were nonobvious; and 4) MacDermid's general counsel instructed MacDermid to

"change formulation [of ChromKlad 2500] based on Atotech's assertion of patent protection under US patent #5,176,813," indicating MacDermid's objective view that the patents are valid.

Dr. Newby invented something wholly unexpected and indeed the "opposite" of what MacDermid's expert admits the prior art taught—a hallmark of nonobviousness. (Baudrand Depo., pp. 115-116.)

### C. There Is No Inequitable Conduct—Atotech's Patents Are Enforceable.

Although MacDermid claims that there is no "genuine issue of material fact" that the patents in suit were obtained through inequitable conduct, the objective facts say otherwise:

- Caterpillar, a potential customer for ChromKlad 2500, after reviewing MacDermid's position, analyzed the patents in suit and concluded that they are enforceable; (Ex. R.)

- 

- After having supposedly completed a review of the enforceability of Atotech's '813 Patent in connection with the LPW applications, MacDermid's general counsel instructed MacDermid to "change formulation [of ChromKlad 2500] based on Atotech's assertion of patent protection under US patent #5,176,813." (Ex. S.)

MacDermid's loose charges—devoid of factual support—cannot be the basis for inferring that Dr. Newby acted with intent to deceive. Rather, the Federal

Circuit strictly requires objective proof: "[t]he potential for prejudice flowing from unwarranted charges of improper conduct led [the Federal Circuit] to establish objective rigor . . . there must be *material misrepresentation or omission* by the applicant, *with the intent to deceive or mislead* the examiner, in order to establish improper conduct in patent prosecution." *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997) (internal citations omitted).

As a threshold matter, MacDermid fails to provide *any* basis supporting a finding of deceptive intent. This alone mandates dismissal of MacDermid's claim. *See Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("[w]ithout a factual basis to establish a threshold level of deceitful intent, *the inequitable conduct analysis is at an end*") (emphasis added). The Federal Circuit recently affirmed that even gross negligence does not necessarily support finding inequitable conduct. *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 439 F.3d 1335, 1343 (Fed. Cir. 2006). Here, with no basis to infer even simple negligence, MacDermid is pushing for what amounts to strict liability for any nondisclosure, regardless of materiality. As the Federal Circuit made clear: "[s]uch is not the law." *Id.* (reversing summary judgment).

Indeed, MacDermid's expert concedes that—even if its allegations are true—there was *no intent* to deceive the Patent Office. MacDermid's expert admitted that he believes Dr. Newby to be "*honest*" and that any alleged

misconduct "could have been ***unintentional***." He even testified that "while [Dr. Newby] committed inequitable conduct, ***he did not do it maliciously or deliberately***." (Baudrand Depo., p. 148.) MacDermid's shortcoming: unintentional or even negligent inequitable conduct ***does not exist***. *Northern Telecom Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990).

Finally, without any objective basis to infer intent, MacDermid's motion is particularly misplaced as "***[i]ntent to deceive is a factual issue that, if contested, is not readily determined within the confines of Fed. R. Civ. Proc. 56.***" *KangaROOS USA, Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1576 (Fed. Cir 1985)(emphasis added). A determination of culpable intent "is ***rarely*** enabled in summary proceedings." *Id.* at 1577 (emphasis added); *see also*, *Monsanto Co. v. Mayer Bioscience N.V.*, 363 F.3d 1235, 1240 (Fed. Cir. 2004). For this reason alone, MacDermid's motion for summary judgment should be denied.

### 1.   The European Patent Office and LPW Established That The LPW Catalyst Application Was Not Material.

In an argument long on invective but lacking support and cites, MacDermid claims that there is a "strong inference" that the LPW Catalyst application[5] was

---

[5]   Apparently hoping to borrow a bit from each of the LPW applications to enhance its materiality argument, MacDermid is noticeably ambiguous about which LPW application it is specifically referring to, often switching back and forth between referring to LPW reference and LPW reference_s_. In context the section would apply only to the LPW Catalyst application.

material to the examination of the patents in suit since it was cited by the European

Patent Office in the examination of the corresponding European application. What

MacDermid omits are three very important facts:

      1)     the European Patent Office treated the LPW Catalyst application and

the '481 patent as disclosing the same information when examining the European

equivalent to the patents in suit—in other words it treated them as *cumulative*;

      2)     the European Patent Office determined that the European equivalent

to the patents in suit was patentable over the LPW Catalyst application—in other

words that the LPW application was *not material*; and

      3)     MacDermid's expert admitted that the disclosures of the LPW

Catalyst application and the '481 patent were "essentially the same." (Baudrand

Depo., pp. 195-96.)

On this basis alone, MacDermid fails to establish even the baseline

materiality required to prove inequitable conduct. The Federal Circuit makes

clear: "a patentee has no obligation to disclose an otherwise material reference if

the reference is *cumulative* or *less material* than those already before the

examiner." *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1440

(Fed. Cir. 1991) (emphasis added).

Disagreeing with the conclusion of the European Patent Office and its own

expert, MacDermid now argues that the LPW Catalyst application is more material

than the '481 patent because it includes examples using MDSA and that it suggests

that MDSA is less corrosive to the *cathode* than some other catalysts. Again,

MacDermid neglects to mention a number of important facts. First, it makes little

matter that the LPW Catalyst application includes specific examples mentioning

MDSA when the patents in suit *expressly disclose* the use of MDSA in the '481

patent:

> and corrosion of the anode. The disclosure of U.S. Pat. No.
> 4,588,481 specifies a variety of sulfonic acids, including
> methanesulfonic acid (MSA), ethanesulfonic acid (ESA),
> methanedisulfonic acid (MDSA) and 1,2-ethanedisulfonic
> acid (EDSA). Generally for economic reasons, MSA has
> become the agent of choice in a number of commercial
> embodiments for chromium plating which have appeared in
> the marketplace, even though severe scale buildup and
> anodic corrosion are encountered.

(Ex. X, '813 patent, col. 1, lines 45-54; Ex. Y, '175 patent, col. 1, lines 50-58.)

This is not a case where the examiner might be more likely to appreciate the

use of MDSA in the LPW Catalyst application than in the '481 patent because of

examples in the former. Atotech went out of its way in fulfilling its duty of candor

by not just citing the '481 patent, but explicitly stating that it discloses MDSA.

Second, the LPW Catalyst application mentions *erosion or etching of the*

*cathode*—not *corrosion of the anode*—two wholly different materials that behave

wholly differently. In fact, the corrosion problem solved by Dr. Newby's

invention is specific to lead anodes, and lead is never the material being plated as

the cathode. Further, the '481 patent discusses the fact that a problem with mixed

22

catalyst chrome plating systems is that they severely etch the cathode, but they have ***no corrosive effect on the anode***. To say that the LPW Catalyst application is more material than the '481 patent based on ***speculation*** that a material will *erode* one material at the cathode and, in turn, *corrode* a wholly different material at the anode cannot be the basis for inequitable conduct.

The LPW Catalyst application adds nothing of substance not already disclosed in the '481 patent and described to the Patent Office in the very patents in suit—it is wholly cumulative. MacDermid's claim should be dismissed.

### 2. There Was No Deceptive Conduct In Not Providing A Complete Translation Of The LPW Anode Application To Patent Office.

MacDermid argues briefly that Atotech misled the U.S. Patent Office by not providing a translation of the LPW Anode application because "[Dr.] Newby knew that the LPW Anode application described an electroplating process using a lead anode with a MDSA plating bath." (MacDermid's Summary Judgment Brief, p. 34.) Again, MacDermid does not provide a single citation to any evidence. Moreover, it is flat out wrong. The Federal Circuit recently emphasized that failure to provide a complete translation, standing alone, is not a sufficient basis for finding inequitable conduct. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 1001 (Fed. Cir. 2006) (reversing finding of inequitable conduct based on failure to provide translation); *see also Semiconductor Energy Lab. Co. v. Samsung Elecs.*

*Co.*, 204 F.3d 1368, 1378 (Fed. Cir.2000) ("The duty at issue in this case is the duty of candor, not the duty of translation.").

Moreover, the LPW Anode application does not disclose MDSA.  Indeed, MacDermid's expert testified that the LPW Anode is limited to an alkyl *mono*sulfonic acid, specifically MSA, and characterized its disclosure of MSA as the *"opposite"* of the invention of the patents in suit.  (Baudrand Depo., pp. 122-24; 115-116.)

### 3.   Atotech Did Not Evade An Inquiry For The Patent Examiner Or Misrepresent Why MDSA Is Not Corrosion Producing.

Pages 35 though 38 of MacDermid's brief make a number of other wholly meritless accusations regarding inequitable conduct—again without citation—that are discussed fully on pages 29-33 of Atotech's Motion For Summary Judgment.

### D.   MacDermid Infringes Atotech's '175 Patent

Finally, MacDermid claims it does not infringe Atotech's '175 Patent for a single reason—that its ChromKlad 2500 process uses MDSA instead of an alkylsulfonic acid.[6]  Atotech agrees that the ChromKlad 2500 process does not use an alkylsulfonic acid—that, however merely proves that MacDermid *does* infringe.

---

[6]   Notably, MacDermid agrees in this context that "alkylsulfonic acid" means a monosulfonic acid and does not include a polysulfonic acid, like MDSA.

In other words, MacDermid is practicing, by its own admission, the very essence of Dr. Newby's invention as claimed in the '175 patent—the use of a polysulfonic acid instead of a corrosion producing amount of an alkylsulfonic acid as was used in the prior art before Dr. Newby's invention.

MacDermid tries to escape infringement through an inordinately narrow claim construction that bears no semblance to the invention of the patent, as discussed in Atotech's Response to MacDermid's Opening Markman Brief. Indeed, the claim construction that MacDermid advocates for noninfringement is markedly different from the claim construction it advocates for its invalidity arguments-drawing into question the credibility of both arguments.

MacDermid's motion should be denied.

## III.   CONCLUSION

After more than a year of discovery and over a dozen depositions MacDermid offers little in the way of evidence, but instead supposition and speculation in support of its motion for summary judgment.

Its motion should be denied in all respects.

Respectfully submitted,

s/ William J. O'Shaughnessy
William J. O'Shaughnessy
Richard Hernandez
MCCARTER & ENGLISH, LLP
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652
(973) 622-4444
woshaughnessy@mccarter.com

Jay R. Campbell
Todd R. Tucker
Joshua M. Ryland
RENNER, OTTO, BOISSELLE & SKLAR, LLP
19th Floor
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113